Filed 2/23/22  Aminpour v. Fulkerson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ASHKAN KING AMINPOUR et al.,<br><br>    Plaintiffs, Cross-defendants and Respondents,<br><br>    v.<br><br>DAN FULKERSON et al.,<br><br>    Defendants and Appellants. | D078288<br><br><br>(Super. Ct. No. 37-2018-00054834-CU-BT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Pettit Kohn Ingrassia Lutz & Dolin, Douglas A. Pettit, and Caitlin M. Jones for Defendants and Appellants.

Higgs Fletcher & Mack, Paul Pfingst, Susan M. Hack; Shoecraft Burton, Robert D. Shoecraft; Khashayar Law Group, Daryoosh Khashayar, and Taylor Marks for Plaintiffs, Cross-defendants and Respondents.

Dan Fulkerson and Paul Batta appeal an order denying their motion under Code of Civil Procedure section 425.16[1] to strike claims brought against them by Ashkan "King" Aminpour and Larking, Inc. for conspiring with Aminpour's former client and business partner, Lara D. Calhoun, to defraud Aminpour. Aminpour initially sued Calhoun after she threatened to report him to authorities if he did not pay her $450,000. After discovery in Aminpour's case uncovered phone conversations between Calhoun and Fulkerson and Batta, both attorneys formerly employed by Aminpour, Aminpour successfully moved to amend the complaint to add conspiracy and other claims against Fulkerson and Batta. In response, Fulkerson and Batta filed an anti-SLAPP motion. The trial court denied the motion, finding the challenged claims did not arise from protected activity. As we shall explain, we agree with the trial court and affirm its order.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2013, Calhoun was injured in a serious car accident involving an 18-wheeler truck. In May 2015, Calhoun hired Aminpour and his law firm, Aminpour & Associates, to represent her in a personal injury lawsuit against the trucking company. According to Aminpour, he assigned Calhoun's case to Fulkerson and Batta. The firm filed a complaint on behalf of Calhoun on January 26, 2016, after the two-year statute of limitations on her claims had passed. As a result, the case was dismissed with prejudice.

In this litigation, Fulkerson and Batta deny that Aminpour assigned them to work on Calhoun's case. However, in his declaration in support of the anti-SLAPP motion at issue here, Batta explained that while the firm did

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise indicated. Section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

2

not have a "formal system in place for managing the statute of limitation[s]" he "generally checked the statutes of limitation on the firm's cases." Therefore, Batta states, he "took responsibility for Calhoun's claim expiring."

At some point after learning Calhoun's claims had been mishandled by his firm, Aminpour arranged a meeting with Calhoun. Aminpour, Calhoun, Fulkerson, Batta, and another attorney employed by the firm, Jeffrey Bodily, were present. Aminpour told Calhoun the statute of limitations on her case had expired before the claim was filed, and that he would find a malpractice attorney to represent her in a case against the firm or pay her directly the amount she would have recovered had her personal injury case been successful.

On April 16, 2016, Aminpour terminated Fulkerson and Batta from his firm. According to Aminpour, he fired the attorneys because of their negligence in handling Calhoun's case. Fulkerson disputes he was fired by Aminpour, stating he ended his employment with Aminpour after he discovered "settlement checks showing that medical providers had not been paid on many closed cases." Fulkerson alleges that when he confronted Aminpour about this discovery, Aminpour acknowledged he had insufficient funds in his client trust account to pay the medical providers. Fulkerson believed Aminpour had been using client settlement funds to pay for his own "lavish lifestyle." Fulkerson also alleges that Aminpour threatened to kill him if Fulkerson reported him to the State Bar.

Calhoun opted to pursue a malpractice case against Aminpour. Calhoun believed she initially retained attorney Robert Hamparyan, with Aminpour's assistance, to represent her. At some point, Hamparyan was fired and Calhoun, again with Aminpour's assistance, retained Alfred Atallah

3

to represent her in the malpractice action. Atallah was a friend of Aminpour's and had previously represented Aminpour.

Before Calhoun's malpractice claim arose, Aminpour and Calhoun developed a friendship. As a result of this relationship, in May 2016, Calhoun told Aminpour about a new product she was developing—disposable sanitary covers for public seating areas. Aminpour was interested in the idea and proposed they partner to bring the product to market. Aminpour would contribute capital and Calhoun would undertake all of the work to bring the product to fruition, with each taking 50% ownership of the new business. Aminpour contributed $110,000 to the formation of the company and the business was incorporated in September 2016 with the assistance of attorney Richard D. Clarke.

The parties dispute whether in the formation of the new business Aminpour complied with the California Rules of Professional Conduct governing business relationships between an attorney and a client or former client. In his declaration in support of his opposition to the anti-SLAPP motion, Aminpour stated that he advised Calhoun to seek counsel before they incorporated the new company, Larking, Inc., and that he advised her in writing of the disclosures required by the Rules. Aminpour also stated Clarke reviewed the corporate formation documents in detail with Calhoun before they were signed. Calhoun's verified cross-complaint against Aminpour, on the other hand, states that he failed to obtain informed written consent from her and otherwise did not comply with the Rules.

The malpractice action was settled in March 2017 and Calhoun and Aminpour entered into a release agreement providing Calhoun with $750,000, the limit of Aminpour's malpractice insurance policy. Calhoun's attorney, Atallah, was paid 40% of the settlement proceeds. Calhoun

4

testified in her deposition she received $280,000. From that amount, Calhoun gave Aminpour a check for $136,964.49. The check's memo stated, "King [i.e., Aminpour] to disburse to me." A note that accompanied the check, signed by both Aminpour and Calhoun, stated "Lara giving $136,964.49 to King [i.e., Aminpour] to hold & pay $5,000 per month auto payments on Ford Explorer till balance is zero. No interest."

At some point thereafter, the relationship between Calhoun and Aminpour strained. During discovery at her deposition in the underlying litigation, Calhoun stated that she did not know that Atallah would receive 40% of the proceeds from the malpractice settlement. She became suspicious of Aminpour and began researching the ethical obligations of attorneys. She also reached out to several attorneys to discuss the situation. Calhoun first contacted attorney Ray Ryan to discuss her concerns about Aminpour's referral to Atallah to handle her malpractice action. Calhoun also contacted Hamparyan, the attorney Calhoun previously hired and fired in connection with the malpractice lawsuit.

In February 2018, Calhoun spoke with Fulkerson about her potential claims against Aminpour relative to the malpractice action and the propriety of their business relationship. Later that year, Calhoun also contacted Batta, Bodily, and another attorney, Deborah Wolfe, to discuss Aminpour's actions. In June 2018, Calhoun held a meeting at Wolfe's office with Wolfe, Fulkerson, Batta, and Bodily. Bodily described the meeting as "a strategy conference among Calhoun's various legal advisers regarding any legal rights she might have had against Aminpour."

Batta similarly described the meeting, stating "Calhoun sought the advice of the attorneys present on a number of legal issues pertaining to her history with Aminpour—from the way her case was handled at [Aminpour &

5

Associates] to the business she founded with Aminpour." Batta further stated that "[t]he attorneys present at the meeting provided Calhoun with counsel and strategy in the context of privileged and confidential communications." Fulkerson stated the meeting's topic was Calhoun's "potential remedies against Aminpour" and that the meeting was a continuation of privileged conversations he had with Calhoun about her legal concerns with Aminpour's conduct. In the months after, Calhoun continued to speak with Fulkerson and Batta on the phone periodically. Both attorneys characterized the phone conversations as legal consultations.

In October 2018, Calhoun arranged a lunch meeting by text message with Aminpour. The messages showed a friendly relationship, and gave Aminpour no indication that Calhoun was upset with him. Sensing something was amiss, however, Aminpour brought an employee with him to the restaurant where the meeting was held. When Aminpour and his employee arrived, Calhoun was there with her mother and adult daughter. According to Aminpour, the three women were visibly upset. Once they were seated, Calhoun's daughter told Aminpour he had two options, either sign a document she passed to Aminpour relinquishing ownership of Larking, Inc., or Calhoun would report Aminpour to the authorities and he would lose his law practice and face incarceration.

In his declaration in opposition to the anti-SLAPP motion, Aminpour stated that Calhoun then told him she had spoken to people who worked for Aminpour in the past, who told her about Aminpour's wrongdoing. Aminpour also alleged Calhoun said if he didn't sign the document, she would immediately contact law enforcement, the State Bar, and the media. According to Aminpour, Calhoun's mother added that if Aminpour paid Calhoun $500,000 they would guarantee Aminpour would not go to jail.

6

Calhoun clarified she sought $444,000 and showed Aminpour a paper showing what she believed she was owed for Larking, Inc. Aminpour refused to sign the document and left.

The following day, Calhoun sent an email to Aminpour repeating her demand that Aminpour sign the document relinquishing his ownership of Larking, Inc., or be reported to the State Bar, and describing in detail the wrongdoing she alleged Aminpour perpetrated. The email asserted Aminpour had improperly used client funds to lend money to other clients, taken improper business tax deductions, violated his professional ethical obligations by entering into business with Calhoun and with respect to the malpractice action, and defrauded Calhoun by placing his brother on the Larking, Inc. board. The email also detailed "lies" Aminpour told Calhoun and acts of sexual harassment.[2]

On October 29, 2018, Aminpour brought the underlying civil action against Calhoun, her mother, and her daughter alleging various causes of action based on what Aminpour characterized as extortion.[3] On December 3, 2018, Calhoun, representing herself, filed a cross-complaint alleging breach of fiduciary duty, fraud, negligence, breach of contract, intentional and negligent interference with prospective economic advantage, and other

[2]     Calhoun did report Aminpour to the California State Bar, which investigated the alleged professional misconduct. The agency closed the matter in 2019 after determining it did "not warrant further action."

[3]     Aminpour also reported Calhoun's conduct to law enforcement, who eventually brought criminal extortion charges against Calhoun. Aminpour asks this court to take judicial notice of documents in the criminal case that were not before the trial court. We deny the motion on the grounds the documents are not relevant to this appeal. Aminpour also asks this court to take judicial notice of a recently published Court of Appeal opinion. This request is denied as unnecessary.

claims. In discovery, Aminpour obtained Calhoun's phone records, which exposed her communications with Fulkerson and Batta.

At her deposition, Calhoun stated she contacted Fulkerson, Batta, and the other attorneys she met with in June 2018. Calhoun, who was by this point represented by counsel, did not answer questions about the subject of her communications with the attorneys based on her counsel's instruction that the communications were protected by the attorney-client privilege. Thereafter, Aminpour served Fulkerson and Batta with subpoenas for their depositions. Fulkerson and Batta objected, asserting among other things that the notices implicated attorney-client privileged information and matters that were subject to the separation agreement between the attorneys and Aminpour & Associates.[4]

In June 2020, Aminpour successfully moved to amend his complaint to add civil conspiracy, civil extortion, fraud, intentional interference with prospective economic advantage, and intentional interference with contractual relations claims against Fulkerson and Batta. The complaint alleged Fulkerson and Batta were disgruntled former employees of Aminpour's who were out for revenge against him, and who had conspired with Calhoun to extort and defraud him.

In response to the First Amended Complaint, Fulkerson and Batta filed the anti-SLAPP motion, asserting the claims against them arose from the protected activity of providing legal advice to Calhoun and further that Aminpour and Larking, Inc. could not establish a probability of prevailing on their claims against Fulkerson and Batta. In support, Fulkerson and Batta filed their own declarations, the declarations of Bodily and Calhoun, and

---

[4]     Fulkerson also objected on the grounds that Aminpour had made death threats against him.

documentary evidence including excerpts from Calhoun's deposition and other discovery responses, Calhoun's malpractice settlement agreement, Fulkerson's and Batta's separation agreements with Aminpour & Associates, and Aminpour's deposition subpoenas to both attorneys.

Aminpour opposed the motion, arguing Fulkerson and Batta had not met their burden to show his claims arose from protected activity because there was no evidence that at the time the attorneys communicated with Calhoun she was seriously contemplating litigation. Aminpour also argued he had shown a probability of prevailing on his claims, pointing primarily to the timing of Fulkerson's and Batta's communications with Calhoun, particularly the fact that Fulkerson had an approximately 20 minute phone call with Calhoun shortly before she sent the email on October 18, 2018 reiterating her demand to Aminpour. Aminpour argued that the motion should be denied because Fulkerson's and Batta's conduct was illegal, and thus not protected under section 425.16.

In reply, Fulkerson and Batta asserted there was no evidence they had engaged in any illegal activity and the evidence showed only protected attorney-client communications. In addition, they argued that Aminpour had failed to address legal authority establishing that protected activity under the anti-SLAPP statute includes the right to counsel others about their rights to petition the courts, even if litigation is not "imminent."

Thereafter, the trial court issued a tentative order denying the motion. The tentative decision noted that "[c]ommunications that are preparatory to or in anticipation of the bringing of an action or other official proceeding are within the scope of protected conduct under … section 425.16" and that "[c]onduct 'preparatory to' litigation can include communications in connection with counseling or encouraging others to sue." The court,

9

however, agreed with Aminpour that Fulkerson and Batta were required to show that at the time of Calhoun's communications with these attorney defendants, future litigation "was actually under serious consideration." The court wrote that because none of the declarations submitted in opposition to the motion showed there was a discussion of anticipated litigation, Fulkerson and Batta had not made a prima facie showing that Aminpour's claims against them arose from protected activity.

The tentative order declined to reach the second prong of the anti-SLAPP analysis, but did not conclude that Aminpour had not presented any evidence that Fulkerson and Batta had committed any overt act in furtherance of the alleged extortion scheme or that their conduct was illegal as a matter of law, and thus, the court stated, this was not a basis to deny the motion under the first prong. After issuing the tentative, the parties orally argued the motion and the court took the matter under submission.

The court issued an order confirming its tentative decision, and adding commentary. The court's final order stated that Fulkerson's and Batta's declarations did "not disavow participating" in an extortionate scheme with Calhoun or "expressly state[] that in their discussions with Calhoun future litigation was seriously considered or contemplated. In fact, Calhoun had already settled her legal malpractice case against Aminpour. Even assuming Calhoun consulted with Fulkerson and Batta regarding potential legal claims, this does not necessarily immunize them from the possibility that they also participated with Calhoun in a separate conspiracy to commit extortion. The allegations within the First Amended Complaint do not, in isolation, disclose protected conduct. In addition, the evidence presented via this motion is in conflict and does not necessarily weigh in favor of the existence of protected conduct." The court concluded the order by stating that

10

Fulkerson and Batta "have not met their burden of demonstrating that the challenged cause of action is one arising from protected activity."

DISCUSSION

As discussed, Fulkerson and Batta challenge the trial court's conclusion that Aminpour's claims against them do not arise from protected activity. Further, they argue that Aminpour and Larking, Inc. (collectively Aminpour) did not meet their burden to show the claims had a probability of success on their merits.

I

*Legal Standards*

Section 425.16 sets a procedure for striking "lawsuits that are 'brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 197.) Under section 425.16, the "trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

Section 425.16 provides in pertinent part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Resolution of an anti-SLAPP motion "thus involves two steps. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been

11

made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819–820.) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' " (*Id.* at p. 820.)

"An ' "act in furtherance of a person's right of petition or free speech …" ' includes any written or oral statement made before a legislative, executive, or judicial body, or any other official proceeding authorized by law, or in connection with an issue under consideration by such body or in such proceeding. (§ 425.16, subd. (e)(1) & (2).) The moving party need not separately demonstrate that such an oral or written statement concerns an issue of public significance." (*Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 271.) The statute is construed broadly to maximize protection for acts in furtherance of the right to petition the courts. (§ 425.16, subd. (a) ["The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."].)

"A defendant's burden on the first prong is not an onerous one. A defendant need only make a prima facie showing that plaintiff's claims arise from the defendant's constitutionally protected free speech or petition rights. (See *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456.) ' "The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law." [Citation.] "Instead, under the statutory scheme, a court

12

must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens." ' " (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 112, italics omitted; see also *RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 426 (*RGC Gaslamp*) ["Any claimed illegitimacy of the defendant's acts is an issue that must be raised and supported by the plaintiff in discharging its burden on prong two. [Citations.] 'To conclude otherwise would effectively shift to the defendant a [merits] burden statutorily assigned to the plaintiff.' "].)

For purposes of both prongs of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff…." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) With respect to the second prong, "in order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] [Like the trial court, we] consider 'the pleadings, and supporting and opposing affidavits … upon which the liability

13

or defense is based.' (§ 425.16, subd. (b)(2).)" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) Our de novo review "includes whether the anti-SLAPP statute applies to the challenged claim." (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645.) "[W]e apply our independent judgment to determine whether" the claim arises from acts done in furtherance of the defendants' "right of petition or free speech in connection with a public issue." (*Ibid.*) "Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether [the plaintiffs have] established a reasonable probability that [they will] prevail on [their] claims." (*Ibid.*)

## II

### *Analysis*

As discussed, Fulkerson and Batta take issue with the court's determination that the claims against them do not arise from protected activity. Specifically, they argue the only actionable conduct alleged by Aminpour are communications that Fulkerson and Batta had with Calhoun that were preparatory to or in anticipation of Calhoun bringing a lawsuit against Aminpour. Thus, Fulkerson and Batta contend, they made a prima facie showing the conduct is protected.

### A

The question whether a cause of action arises from protected activity concerns "the strength of the connection between [that] activity and the lawsuit …." (*Smith v. Adventist Health System / West* (2010) 190 Cal.App.4th 40, 51.) To be afforded protection, " 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an

14

act in furtherance of the defendant's right of petition or free speech. [Citations.]' " (*Ibid.*; see also *Navellier v. Sletten, supra*, 29 Cal.4th at p. 92 ["The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning."].) " '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' " (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477.)

" 'Under the plain language of section 425.16, subdivision (e)(1) and (2), as well as the case law interpreting those provisions, all communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute.' " (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 408–409.) Further, " '[j]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], … such statements are equally entitled to the

benefits of section 425.16.' "[5] (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.)

Critically here, and as the parties agree, to be protected the communications must relate "to litigation that is contemplated in good faith and under serious consideration." (*Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 36 (*Rohde*).) "[T]he privilege 'arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a proposed proceeding … as a means of obtaining access to the courts for the purpose of resolving the dispute.' " (*Id*. at p. 36.) The imminency of the litigation is not crucial, rather it is the remoteness of the petitioning activity that matters. (*Ibid.*) "The requirement to show that litigation is seriously contemplated ensures that prelitigation communications are actually connected to litigation and that their protection therefore furthers the anti-SLAPP statute's purpose of early dismissal of meritless lawsuits that arise from protected petitioning activity." (*Bel Air, supra,* 20 Cal.App.5th at p. 941.)

"Thus, for example, when a cause of action arises from conduct that is a 'necessary prerequisite' to litigation, but will lead to litigation only if negotiations fail or contractual commitments are not honored, future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity." (*Bel Air, supra*, 20 Cal.App.5th at p. 941; see, e.g., *Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15

<hr>

[5] "The litigation privilege established by Civil Code section 47, subdivision (b) and the anti-SLAPP procedure established by Code of Civil Procedure section 425.16 are substantively different and 'serve quite different purposes.' [Citation.] Nevertheless, the two statutes are related, and courts 'have looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry.' " (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 941, fn. 6 (*Bel Air*).)

Cal.App.5th 686, 703–704 [letter commencing termination of a distributor agreement was not preparatory to statutorily required arbitration, as the statute permitted resort to arbitration only if good-faith negotiations failed]; *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 826–827 [insurance claims are often paid in the ordinary course of business and are therefore not protected prelitigation activity unless the circumstances show that a claim was merely a necessary prerequisite to expected litigation].) Further, "the privileged communication must have some relation to an imminent lawsuit or judicial proceeding which is *actually* contemplated seriously and in good faith to resolve a dispute, and not simply as a tactical ploy to negotiate a bargain." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 36; see also *Bel Air,* at p. 941 ["[P]ayment demands with vague references to future ' "legal remedies" ' may not demonstrate that litigation was actually under serious consideration."].)

B

The crucial question here is whether at the time of the conduct Aminpour alleges is actionable, Calhoun's claims against him were more than a possibility, and instead had "ripened into a proposed proceeding" to resolve her dispute with him, and the communications with the defendants were in furtherance of that proceeding. (*Rohde, supra*, 154 Cal.App.4th at p. 36.) We agree with the trial court that Fulkerson and Batta failed to make this showing.

The trial court found "[t]he declarations of Fulkerson, Batta and Jeff Bodily establish that Fulkerson, Batta, Calhoun (and others) attended a June 2018 meeting in which Calhoun sought advice regarding legal issues and legal strategies," and that "Calhoun also communicated with Fulkerson and Batta on other occasions seeking legal advice." The court then noted that

17

"none of [the] declarations refer to any discussion of anticipated litigation" and that "Fulkerson and Batta do not represent Calhoun, except in the context of a recent and unrelated personal injury action." The court concluded that "[t]his evidence does not support the serious contemplation of litigation during these meetings."

In the operative complaint, Aminpour alleges generally that Fulkerson and Batta conspired with and aided and abetted Calhoun in extorting and defrauding him, and that they did so in order to harm Aminpour's and Larking, Inc.'s business. As explained in Aminpour's evidentiary submission in opposition to the motion to strike, the allegations are based on (1) cell phone records showing Fulkerson and Batta communicated frequently with Calhoun, including just prior to her sending the October 18, 2018 email; (2) Calhoun using information in the extortion email that Aminpour alleges only Fulkerson or Batta could have provided to her; (3) the fact that Calhoun initially denied knowing Fulkerson or Batta in her responses to Aminpour's requests for admissions, then admitted knowing them in her deposition after the phone records were discovered; and (4) an email from Fulkerson to Scott Savary, who Aminpour describes as his "colleague," in which Fulkerson tells Savary he has "nothing to do with whatever is going on between [Aminpour] and Mrs. Calhoun" and asks Savary to tell Aminpour to "keep our names [his and Batta's] out of his mouth, and we will do the same." The only conduct alleged by Aminpour that gives rise to his claims against Fulkerson and Batta are their communications with Calhoun.

The evidentiary submissions made by Fulkerson and Batta in support of their anti-SLAPP motion show that Calhoun was seeking legal advice from them about her dealings with Aminpour. This evidence consists of statements by Fulkerson, Batta, Bodily, and Calhoun. Specifically, Bodily

18

described the meeting as "a strategy conference among Calhoun's various legal advisers regarding any legal *rights she might have had* against Aminpour." (Italics added.) Batta described the meeting as "Calhoun [seeking] the advice of the attorneys present on a number of legal issues pertaining to her history with Aminpour—from the way her case was handled at [Aminpour & Associates] to the business she founded with Aminpour." Batta further stated that "[t]he attorneys present at the meeting provided Calhoun with counsel and strategy in the context of privileged and confidential communications."

Fulkerson stated the meeting's topic was Calhoun's "*potential* remedies against Aminpour" (italics added) and that the meeting was a continuation of privileged conversations he had with Calhoun about her legal concerns with Aminpour's conduct. Fulkerson's and Batta's evidentiary submission about their other phone communications with Calhoun likewise characterized the conversations generally as legal consultations. Calhoun's declaration states that she "consulted with a number of attorneys as it related to *potential* claims involving" Aminpour, including Fulkerson and Batta, and that she "genuinely believed" she "had valid claims against" Aminpour. (Italics added.) In support of the motion, Fulkerson and Batta also pointed to the fact that Calhoun did eventually bring claims against Aminpour, first by way of a complaint to the state bar and then in this case.

Fulkerson and Batta argue that this evidence shows Calhoun was seeking advice in preparation to sue Aminpour, and thus the conduct is protected. Although it is a close decision, made difficult because the content of the communication is obscured by privilege, we disagree. It is significant that of the various attorneys present at the June 2018 strategy session, Aminpour sued only Batta and Fulkerson, who the evidence showed had

19

repeated and continuing contact with Calhoun after the June meeting. Indeed, the complaint seeks to make clear that their liability is not alleged to be based on the offering of legal advice. In any event, as the trial court found, the evidence shows only that Calhoun was investigating *potential* claims against Aminpour. She, Fulkerson and Batta all state as much in the declarations; none go so far as to indicate they were actually preparing to file suit. As the trial court stated, the declarations do not "refer to any discussion of anticipated litigation" and Calhoun did not file her counter-claims until December 2018, after she was sued by Aminpour. Further, she never retained Fulkerson and Batta (or any other attorney she consulted in June 2018) to represent her in any litigation against Aminpour. No evidence shows that litigation was more than just a possibility when Calhoun was communicating with the defendants.[6]

*Rohde, supra*, 154 Cal.App.4th 28, is a helpful comparison. There, brother and sister, both represented by counsel at the relevant time, were engaged in a dispute over the distribution of their deceased father's assets. (*Id*. at p. 31.) Brother's attorney, Wolf, sent a demand letter to sister's attorney, Catanese, prompting Catanese to respond that a civil suit was forthcoming. (*Id*. at p. 32.) This resulted in an agreement to sell certain property and to hire a realtor to facilitate the sale. (*Ibid.*) Wolf and his client

---

[6]     Contrary to Fulkerson and Batta's assertion, this is not an importation of a merits inquiry into the first prong analysis as this court discussed in *RGC Gaslamp, supra*, 56 Cal.App.5th 413. There, we cautioned that a determination on the first prong that the filing of a mechanic's lien was invalid as a matter of law because it duplicated a prior filing constituted an improper examination of the merits of the claim. (*Id*. at p. 426.) Here, the court is tasked only with drawing a line to decide whether the defendants have made a prima facie showing on the first prong that Aminpour's claims arise from protected petitioning activity.

became suspicious the realtor was acting against the client's interest in concert with the sister, and left voicemail messages for the realtor asserting the realtor and sister were conspiring to defraud the brother out of his interest in the property. (*Id.* at p. 33.)

This prompted the sister to file defamation and slander claims against Wolf. (*Rohde, supra*, 154 Cal.App.4th at p. 34.) Wolf then filed an anti-SLAPP motion to strike the claims, which the trial court denied. (*Ibid.*) The Court of Appeal reversed, concluding the voicemail messages were protected activity because they were made in connection with litigation that was already threatened by the brother and sister, both represented by counsel, against each other. The court noted "the spectre of litigation loomed over all communications between the parties" and the communications at issue were "concerning the subject of the dispute" and anticipated additional litigation. (*Id.* at p. 36.)

Importantly, the litigation between the siblings was not a mere possibility, but was an actual proposed proceeding already threatened by both parties. Here, unlike *Rohde*, there was no threatened litigation by Calhoun at the time of the communications. According to Aminpour, he thought his relationship with Calhoun was in good standing. While the content of the communications is not available, there is no evidence suggesting Fulkerson and Batta were assisting Calhoun with the preparation of a specific case against Aminpour, and both now are clear that they are not representing Calhoun in her litigation with Aminpour and never have.

In short, at least some of Calhoun's communications with Fulkerson and Batta appear to have occurred in the context of her seeking and receiving legal advice, and so are protected by the attorney-client privilege. But any impediments the privilege might create does not alter or lessen the burden

21

that Fulkerson and Batta bear to demonstrate that Aminpour's claims arise out of protected petitioning activity. Here, they have failed to show that at the time of the communications at issue, Calhoun had decided to pursue her claims or that her investigation into Aminpour had "ripened into a proposed proceeding," a showing necessary to bring the conduct within the anti-SLAPP's statute's protection. (*Rohde, supra*, 154 Cal.App.4th at p. 36.) Rather, there was only the potential that litigation could possibly ensue, distinguishing the present case from those cases where prelitigation conduct is held to be protected petitioning activity (See *Contreras v. Dowling, supra,* 5 Cal.App.5th 394 [communicative acts by attorney representing clients in pending or threatened litigation protected], *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 783 [investigative letter sent to potential clients by attorney in preparation to file complaint on behalf of a client with the Attorney General constitutes protected petitioning activity], and *RGC Gaslamp, supra*, 56 Cal.App.5th at p. 426 [filing of mechanic's lien is protected petitioning activity because it is a necessary prerequisite to foreclosure action]; cf. *Mission Beverage Co. v. Pabst Brewing Co., LLC, supra*, 15 Cal.App.5th at p. 704 [letter cancelling beer distribution contract in accordance with state law, which could trigger statutory arbitration but first requires negotiation to resolve the dispute, not protected because the need for

arbitration could be obviated].)[7]  Accordingly, the trial court did not err by denying the motion and we do not reach the second prong of the anti-SLAPP analysis.

## DISPOSITION

The order is affirmed.  Respondents to recover costs of appeal.


McCONNELL, P. J.

WE CONCUR:


DATO, J.


DO, J.

---

[7]  In support of their assertion that Calhoun's communications "were necessary for the furtherance of the right of petition," and thus entitled to protection, Fulkerson and Batta cite *Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1068–1069.  This case is not relevant to whether prelitigation conduct constitutes petitioning activity for purposes of the anti-SLAPP statute.  Rather, in *Tichinin*, the plaintiff City conceded the defendant's challenge of the City's adoption of a resolution admonishing him was protected by the anti-SLAPP statute.  (*Id*. at p. 1061.)  The portion of the opinion cited by Fulkerson and Batta relates to the court's determination on the second prong of the anti-SLAPP analysis, in which it was tasked with deciding if the plaintiff had shown a probability of prevailing on his civil rights claim against the City under 42 United States Code section 1983.  (*Id*. at pp. 1062–1064.)  This analysis required the court to consider whether hiring a private investigator to determine if two members of the city council were having an extra-marital affair was protected petitioning activity under the First Amendment, and is immaterial to the issue here.  (*Ibid*.)

23